MAYER • BROWN

Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020-1001

Main Tel +1 212 506 2500
Main Fax +1 212 262 1910
www.mayerbrown.com

**Andrew J. Pincus**
Direct Tel +1 202 263 3220
Direct Fax +1 202 263 5220
APincus@mayerbrown.com

May 24, 2018

BY ECF

Molly C. Dwyer, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 Seventh Street
San Francisco, CA 94103-1526

Re: *In re Facebook Biometric Information Privacy Litigation*, No. 18-80053

Dear Ms. Dwyer:

This letter brings the Court's attention to the district court's May 21 and May 24 rulings regarding class notice, which were issued after Facebook filed its Rule 23(f) petition ("Petition") and further support granting it.

The district court issued its orders following expedited briefing. The orders require notice to commence by May 31. The orders and the hearing transcript are attached (Exs. A, B, C).

The transcript highlights why Facebook's Petition should be granted. The district court's class certification order concluded that Illinois' extraterritoriality doctrine did not raise individualized issues because "[n]one of the class members are non-residents suing under Illinois law." Facebook's Petition explains that reliance on Illinois residency as the touchstone for application of BIPA contravenes binding Illinois precedent, and ignores that—as the district court itself explained—some class members' claims are more "peripherally" related to Illinois than others, requiring an individualized determination. Petition 16-20.

At the class notice hearing, the district court exacerbated the problem by characterizing class membership as potentially turning on "location" rather than "residency": "you are potentially part of the class" "if you've lived [in Illinois] for any period of time and you're not just passing through." Tr. 13. This confirms that granting certification was error: If class membership potentially turns in relevant part on a user's "location" for "any period of time" that is "not just passing through," there is no doubt that each class member's ability to invoke BIPA turns on individualized proof.

Moreover, the district court's class notice process confirms the need for this Court's intervention. In addition to email notice, the order requires the unprecedented use of Facebook's own service to send millions of users two forms of concededly "duplicative" notice. Tr. 4. This plan will create user confusion, harm Facebook's reputation, and infringe its First Amendment rights. The

Mayer Brown LLP operates in combination with other Mayer Brown entities (the "Mayer Brown Practices"), which have offices in North America, Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

court also set an abbreviated notice period (38 days) that ends *the day before trial*, prioritizing the scheduled July 9 trial date over the due process rights of absent class members and Facebook.

Sincerely,

*/s/ Andrew J. Pincus*

*Counsel for Facebook, Inc.*

# Exhibit A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## Civil Minutes

Date: May 21, 2018 Judge: Hon. James Donato

Time: 1 hour & 4 minutes

Case No. **C-15-03747-JD**
Case Name **In re Facebook Biometric Information Privacy Litigation**

Attorney(s) for Plaintiff(s): Shawn Williams/Patrick Coughlin/John George/Corban Rhodes
Attorney(s) for Defendant(s): Vincent Connelly/Nikki Stitt Sokol/Archis Parasharami Lauren Goldman

Deputy Clerk: Lisa R. Clark Court Reporter: Debra Pas

PROCEEDINGS

Motion re Class Notice - Held

NOTES AND ORDERS

Class notice will be provided by the class administrator through email and by Facebook through "jewel" notifications and Newsfeed inserts. Facebook will identify the list of notice recipients by **May 25, 2018** and will notify the Court by **May 23, 2018** if it has issues meeting that deadline. Notice recipients will include all users present in Illinois for 60 continuous days or longer. If the parties cannot agree on the allocation of the costs of notice, the Court will resolve the issue in a separate proceeding.

The parties will jointly submit final versions of the long-form and short-form notices by **3:00 pm, California time, on May 22, 2018**. The proposed notices will incorporate the changes ordered by the Court at the hearing. The parties should plan to publish the notices no later than **May 30, 2018**, and before then if at all possible.

For the representations by Facebook's counsel that jewel notifications require two weeks to post and Newsfeed posts require one week to post, Facebook is directed to file by **5:00 pm, California time, on May 23, 2018,** a declaration by a Facebook engineer or other responsible individual that gives specific evidentiary support for those timeframes. The declaration should also state whether jewel notifications and Newsfeed posts can be done faster, and if so, how. This deadline extends the time discussed at the hearing to ensure that the declaration is accurate and complete.

The Court may convene an evidentiary hearing in short order if the declaration is not adequate. All counsel and parties are reminded that misrepresentations to the Court may result in sanctions, including monetary, evidentiary, and attorney discipline sanctions.

At Facebook's request, the deadline to file for pretrial materials is extended to **June 7, 2018**. This extends the time discussed at the hearing to ensure that the pretrial filings are focused on the disputes that the parties cannot resolve in good faith. The pretrial conference is continued to **June 21, 2018 at 1:30 pm**.

# Exhibit B

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No. 3:15-cv-03747-JD<br><br>**ORDER RE PRE-TRIAL CLASS NOTICE**<br><br>Re: Dkt. No. 393 |

The revised long-form and short-form class notices that the parties jointly filed, Dkt. Nos. 393-1 and 395-1, are approved subject to these revisions:

For the long-form notice, Page 2 Number 18 should read: "When and where is the trial?" The last sentence of Page 4 Section 7 should refer to page 7, not page 6, and the period after the parenthesis should be deleted. On Page 7, Section 18 should be titled, "When and where is the trial?"

For the short-form notice, on Page 1, the paragraph under "WHO IS IN THE CLASS" should be made identical to Section 10 of the long-form notice ("Am I part of the class?"). Also on Page 1, "WHAT THE CASE IS ABOUT" and the paragraph below should be deleted entirely. On Page 2, the paragraph titled "HOW AND WHEN THE COURT WILL DECIDE WHO IS RIGHT" should instead be titled "WHEN AND WHERE IS THE TRIAL".

For both the long and short-form notices, the opt-out date should be **July 8, 2018**.

For the parties' convenience, drafts showing the Court's changes are attached to this order. These revisions resolve the content of the pre-trial notice forms, and no objections are pending.

With respect to the timeline for publication, the Court continues to have concerns about the accuracy of the representations made by Facebook's attorney on the extended time needed for

jewel notifications and newsfeed posts. The party declaration requested by the Court, Dkt. No. 401, states that Facebook can provide jewel notifications within five calendar days of putting the notice into final form, and within three calendar days for the newsfeed channel. Facebook is ordered to adhere to those timeframes. The parties have not raised any issues about the content of the notifications and newsfeed notices, and so the Court assumes they are ready to go or will be very shortly.

The combination of direct email notices to Facebook users, jewel notifications, newsfeed posts, and the activation of the web page dedicated to the lawsuit and offering electronic opt-out for class members constitutes best practicable notice to individual class members under the circumstances of this case. The parties are free to provide any additional notice they wish, for example, notices in media publications and other forms of outreach.

**The email, jewel notifications, and newsfeed notices must be published no later than May 31, 2018, and before then to the fullest extent possible.**

**IT IS SO ORDERED.**

Dated: May 24, 2018

JAMES DONATO
United States District Judge

# Exhibit C

Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO

IN RE FACEBOOK BIOMETRIC INFORMATION PRIVACY LITIGATION ) No. C 15-3747 JD
) San Francisco, California
) May 21 2018
) 10:00 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff: ROBBINS GELLER RUDMAN & DOWD, LLP
One Montgomery Street
Suite 1800
San Francisco, California 94104
BY: SHAWN WILLIAMS, ESQ.
JOHN GEORGE, ESQ.

ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway
Suite 1900
San Diego, California 92101
BY: PATRICK J. COUGHLIN, ESQ.

LABATON AND SUCHAROW, LLP
140 Broadway
34th Floor
New York, New York 10005
BY: LAWRENCE A. SUCHAROW, ESQ.

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By: Debra L. Pas, CSR 11916, CRR, RMR, RPR
Official Reporter - US District Court
Computerized Transcription By Eclipse



APPEARANCES: (CONTINUED)

For Defendant: MAYER BROWN, LLP
1221 Avenue of the Americas
New York, New York 10020
BY: LAUREN R. GOLDMAN, ESQ.

MAYER BROWN, LLP
1909 K Street, NW
Washington, DC 20006
BY: ARCHIS PARASHARAMI, ESQ.

MAYER BROWN, LLP
71 South Wacker Drive
Chicago, Illinois 60606
BY: VINCENT J. CONNELLY, ESQ.

Also Present: Nikki Stitt Sokol
Associate General Counsel - Facebook

\- - -



Monday - May 21, 2018 10:02 a.m.

P R O C E E D I N G S

---000---

THE CLERK: Calling Case No. 15-3747, In Re Facebook Biometric Information Privacy Litigation.
Counsel?
MR. WILLIAMS: Good morning, your Honor. Shawn Williams, Robbins Geller Rudman and Dowd.
I'm also here with my colleagues Patrick Coughlin and John George from my firm, and Corban Rhodes from the Labaton firm, on behalf of plaintiff.
THE COURT: Okay.
MS. GOLDMAN: Good morning, your Honor. Lauren Goldman of Mayer Brown on behalf of Facebook.
I'm here today with Archis Parasharami, who I think you met before, who will be covering the class action notice issues; with my partner Vincent Connelly, who is one of the people who will be trying the case; and with Nikki Sokol from Facebook.
THE COURT: All right. Okay. We're going to power through the notice issue. Why don't you both -- both come on up.
All right. Now, let's talk about a couple of things first. Who is going to do what?



My sense is, after reviewing everybody's papers, I think the class administrator should send the email, okay? So they can send the email notice. We're going to work out the back office part of this in a moment.
And then, Facebook, I want you to do one of those jewel notifications that I learned about earlier in the case, and, also, a news feed insert. Okay?
MR. PARASHARAMI: Your Honor, may I be heard on those issues?
THE COURT: Yes.
MR. PARASHARAMI: So in light of the fact that your Honor is ordering email notice, which we think is appropriate, the jewel notifications and news feed notices --
THE COURT: I think you need to get a little bit closer to the mic.
MR. PARASHARAMI: I'm sorry.
THE COURT: Just slide it towards you. Slide the thing -- yeah, okay.
All right. Go ahead.
MR. PARASHARAMI: So the news feed notifications and the jewel notifications would be duplicative, unnecessarily duplicative.
THE COURT: They may be duplicative, but our goal here is to give notice. And it's reasonable, in my view, for you anow to do that.

So we will do a jewel notice, or whatever you call it, the jewel thing with the little red light that flashes and the news feed insert.

I'm going to decline Messenger. I don't think that -- that's necessary. I think that seems to be the least likely to get everybody, so Messenger will be declined.

MR. PARASHARAMI: Your Honor, may I be heard on the -- just a little further on the jewel notification?

THE COURT: Yes.

MR. PARASHARAMI: So the Manual for Complex Litigation says using essentially communications processes of a business should be essentially the last resort, only if there are no other feasible alternatives because of the way that it interferes with --

THE COURT: I don't agree with that. We're trying to give the best reasonable notice.

In my view, given your business and your platform, email is just not going to cut it. You need to get the jewel notifications and the news feed. So those will happen.

Now, tell me a little bit about what you did with Cambridge Analytica. So that looks to me -- now maybe I'm wrong because I do not use Facebook. I never have, because I'm a federal judge. I don't use any social media. It's not just Facebook. I don't Tweet. I don't do anything. Now, nevertheless, I understand what you do because people around me



use it.

So my understanding is your postings about Cambridge Analytica were not in news feed and not in jewel. You did something special for that; is that right?

MR. PARASHARAMI: Your Honor, I don't know the details of it, but let me try and address that question. Cambridge Analytica is a totally different situation, your Honor, because it is a communication between the company and its customers. It is not a Court ordered class notice. It's just a different fit.

I mean, I think to the extent that your Honor is raising the possibility of a jewel notification and -- you know, and a news feed, that probably is enough to describe what we would have to do here.

THE COURT: Well, that may be, but what did you all do with -- I'm looking at screenshots and they're not -- they don't look like news feed or jewel.

Is there something else you did? Was there something else Facebook did for Cambridge?

MR. WILLIAMS: Your Honor, I can talk about the news feed piece, at least briefly, because they did do that --

THE COURT: They did do a news feed for Cambridge?

MR. WILLIAMS: -- with Cambridge Analytica. And in our view it's something that is sufficient. It seems cheaper than some other forms of notice.



It is a -- a notice that goes directly to a user's news feed so when they open Facebook, it's the first thing that they see.

THE COURT: No, I understand that and it's ordered. We're -- what I want to know is do you know, maybe -- if you don't know, that's fine.

But, Mr. Williams, for example, do you know, did they do something special for Cambridge?

MR. WILLIAMS: When you say "special" in terms of the news feed?

THE COURT: Was it -- outside of the news feed and outside of jewel, did they have a separate push that they used?

MR. WILLIAMS: I don't know that. I don't know the answer to that. I do know that it was through news feed at least.

THE COURT: At least through news feed. Okay.

And, Mr. Parasharami -- did I get that right?

MR. PARASHARAMI: Yes. Thank you.

THE COURT: You don't know whether they did something?

MR. PARASHARAMI: My understanding is that it's not something special or different outside of its normal channels for communicating with its own users.

THE COURT: Okay. Well, I just happened to see one this morning that is on a mobile phone. It says Facebook, and



it's from Facebook, and it says "Sarah," personalized to the user, and then it goes on from there.

But you don't know whether there was a news feed or something else.

MR. PARASHARAMI: No, I don't. This is something not in the record, your Honor.

THE COURT: All right. Well, it will be news feed, jewel and the emails.

Now, the emails you all are going to do, Mr. Williams. Okay?

Now, my next question is when can we get all of this done? It looked to me like -- can we get it out by May 30th? That's 40 days before trial.

MR. WILLIAMS: I think that's right, your Honor. The papers -- defendant's papers made clear that they could get at least all of the email in a form that could be communicated to the administrator by next Friday, which is May 25th.

THE COURT: Is that right?

MR. WILLIAMS: Assume it goes over to Monday, you're at the 28th, which is at least two days before that.

THE COURT: Maybe you can have them work on the weekend.

MR. WILLIAMS: Oh, that's Facebook.

THE COURT: Okay.

MR. WILLIAMS: They are compiling all the email to

send and will have it all compiled by the end of next week. At least that's what's in their papers.

THE COURT: All right. So May 25th, unless something dramatic happens, will be a bankable date.

Yes.

MR. PARASHARAMI: Your Honor, just to be clear --

THE COURT: I really need you to move the microphone. Just put it right in front of you. Don't bend down. Just move it towards you, so you can stay upright and still speak.

MR. PARASHARAMI: Is this better?

THE COURT: No. Move it closer.

MR. PARASHARAMI: All right. Thanks. Thank you, your Honor.

I just wanted to --

THE COURT: That's better. Go ahead.

MR. PARASHARAMI: Okay. Just on the question of timing. You know, our declarant testified to what we could do under essentially the proposal that we had made, and so I just want to make clear that if -- you know, if it is some different set of people that we're supposed to identify, then this Friday date could never hold.

THE COURT: All right. Well, we can talk with that.

So it looked to me that, Facebook, you can go back -- so you have the IP address and some kind of advertising placement technology to find people, right?



MR. PARASHARAMI: Essentially we have something that we use to predict the home location of users, and that's what we use in our advertising processes.

THE COURT: All right. So you can use both techniques back to January of 2012 and then IP addresses only for 2011 and 2012.

MR. PARASHARAMI: That's essentially right, your Honor.

THE COURT: Seems fine.

Any problem with that, Mr. Williams?

MR. WILLIAMS: Not for locating the email address, no.

THE COURT: Okay.

MR. WILLIAMS: And if --

MR. PARASHARAMI: And -- oh, I'm sorry, Sean.

MR. WILLIAMS: Go ahead.

MR. PARASHARAMI: Just to be clear, your Honor, the idea would be to try to identify individuals who are -- who are users that are residents of Illinois for purposes of identifying and are an over-inclusive, but appropriately tailored group of notice recipients.

THE COURT: Yes. Now, let's talk about what I'm going to call the O'Hare problem. Okay?

So you're living in Colorado. You are a Facebook user. You're connecting through O'Hare. You're there for two hours.



As users often do, you check your Facebook to see what's happening in the 90 minutes that you are, you know, unavailable and then you leave.

Now, that will show an IP address for Illinois, but they are not going to be members of the class. They are residents of Colorado. So how are we going to deal with that?

MR. WILLIAMS: Well, two points there. On the residency issue, I do want to discuss that a little bit. It was one of the things that me and my colleagues and Facebook talked about over the weekend with respect to the content of the notice.

THE COURT: Okay.

MR. WILLIAMS: I think that is a difficult problem. I don't think it's a difficult -- well, let me back up.

I think that if that person who landed in Illinois for an hour, checks their Facebook page, maybe even opened up, took a selfie and uploaded it onto Facebook, that person is going to have a scan of their face geometry done and possibly a template created.

I think your Honor was very, very clear in its class certification order about the class definition being limited to people who had a template created and stored in Illinois. What the Court did not do was -- what the Court did not do was limit it to -- to residents.

THE COURT: It doesn't have to be stored in Illinois.



MR. WILLIAMS: Correct.

THE COURT: It just has to be people who had templates harvested from data.

MR. WILLIAMS: I misspoke.

THE COURT: Yes.

MR. WILLIAMS: I think that the Court did not limit it to people who were, quote/unquote, residents.

We don't really have a -- an issue with the term "resident" unless it becomes a requirement later that -- you know, in a proof of claim that a person must show that they were a legal resident in Illinois at the time that this violation occurred. So we just need to work through that.

THE COURT: I don't think we need to sort through that now. Let's be common-sensical about this. This is an Illinois state law for Illinois people. Okay?

So if you're passing through O'Hare or driving through Peoria, you're not an Illinois person subject to BIPA. That's all we're talking about. So how are you going to sort that out?

Facebook, can you do something?

MR. PARASHARAMI: Yes. Our proposal is to -- in coming up with this list of potential notice recipients, which we believe is over-inclusive, but appropriately tailored for purposes of notice, but our proposal is to look for people who have a predicted home location in the State of Illinois for a

substantial portion of a year. And to us that was a good way to come close to assessing residents. I mean --

THE COURT: Well, just let me jump in.

I don't want to have any game playing with "substantial portion." If they are there, they are there.

Now, I'm only talking about the O'Hare problem. I've intentionally called -- that's my term. I've intentionally called it that so you get the gist of what I'm trying to communicate.

If you are just passing through, you're not in the class. If you have lived there for a month, if you have lived there for two months, if you've lived there for any period of time and you're not just passing through, although you're not a lifetime resident, you are potentially part of the class. Okay?

So I don't want to find out that, you know, you all built in some eight-month limit, so that -- Facebook, you know, if you ran your parameters and if you aren't there for eight months, you're kicked out of the list. That I don't want to have happen.

So how are you going to define that substantial -- can you -- like a -- a week or less. How about that, Mr. Williams?

MR. WILLIAMS: That's fine. And that was the problem I was worried about.

THE COURT: We have to have some -- you need some



gatekeeping time; right?

MR. PARASHARAMI: Yeah. I wonder if that is, unfortunately, way too small just because of the --

THE COURT: Let's talk about that.

How about -- you know, it's possible you could be on a business trip or maybe a trial in the Northern District for two months. How about --

MR. WILLIAMS: I think it's fair to say just a month. If you're in Illinois for a month, that means that you have at least some business or social issue that requires you to be there, use the services of, you know, the state or city that are available to you. And even if you don't have a plan to stay forever or a year, that a month, I think, puts you in a position where you're actually -- you're there and it's a meaningful period of time.

MR. PARASHARAMI: There is sort of an indeterminacy to that that I think is problematic.

And I guess the other point I would make is that this a predicted home location. It's not as though we know for sure; right?

So I guess my take is that if it's a relatively short time, it's really not enough to know if they are there.

You know, I'm not trying to play games or anything like that. I think it makes sense to have something that is, you know, tied to other standards in the law.



So one example might be residency for tax purposes, which is --

THE COURT: That's a year, though. That's too long.

MR. PARASHARAMI: Well, often they say 100- -- you know, let's say over six months. 183 days is the IRS requirement, just as an example.

I mean, I think, to me, that might be better than the alternative of, like, one week or one month. There is --

THE COURT: Let's just think this through. Now, this is notice. Okay? This is not writing checks. There is -- a lot of things have to happen before that ever happens.

Now, it's okay to be -- throw a wider net, cast a wider net for notice. It may be that we use a shorter time period for notice, but should the day come -- and who knows, maybe it won't, but should the day come that claim forms get submitted, we tighten it up. And, you know, you -- if it's less than three months, we'll just presume you were a transient and you're not going to be eligible to get any of the damages that might be awarded.

MR. WILLIAMS: I think that makes sense.

THE COURT: We could do it that way.

MR. WILLIAMS: I think it makes sense. Wider in the beginning and narrow it later.

THE COURT: Okay. So -- yes.

MR. PARASHARAMI: I guess the other thing I would say



is that if we change the parameters, we just do need to have more time in order to effectuate that. I mean, you know, we --

THE COURT: You just push a different date in. I mean --

MR. PARASHARAMI: It's not just like pressing buttons. I think it would take a lot.

THE COURT: It's not just like pressing buttons?

MR. PARASHARAMI: Well, it might be like pressing a lot and lot and lot of buttons.

THE COURT: What else could it be but pressing buttons? You're Facebook.

MR. PARASHARAMI: Your Honor, I appreciate that. I guess maybe I should have been more -- more apt. It's not like pressing one button.

THE COURT: Fine. You have to change the algorithm or whatever.

MR. PARASHARAMI: So then I would, your Honor, ask for enough time to effectuate that. You know, I obviously will warrant that we will work with alacrity, but this is being developed for the first time --

THE COURT: We'll come back to timing at the end. Let's work out all these little things first.

So I'll tell you what. We'll reserve the claimant eligibility issue on location until we get to the claim stage, should that happen. Who knows? It may not.

And for notice purposes, let's just -- I think two months or less is not -- is presumptively transient. So, you know, more than 60 days will be the notice cut-off.

MR. PARASHARAMI: And, your Honor, so my take would be that that should be 60 continuous days, because otherwise if it's --

THE COURT: That's fine. I don't have a problem with that.

MR. WILLIAMS: Well, I guess one thing that we need to know is what -- what are the manners in which they are actually putting parameters around the search now.

THE COURT: You anticipated my next question.

So, Mr. Parasharami, just tell me, just generally, how is all this going to happen? How is that list going to get populated?

MR. PARASHARAMI: Well, so we attempt to look for what's called predicted home location, which is essentially this method that we use for advertising to try and predict, you know, for advertisers where somebody will be. What their home location is on a specific day. Right? And so I guess we would look for the number of hits, you know, for a number of days per person.

So it requires a complicated search. I'm no engineer, so I can't, you know, begin to understand what they do to get there, but I do understand --



THE COURT: Somehow I'm confident Facebook can do it.

But let me just ask this. This is all the existing technology. There is nothing different. For example, you'll just take what Facebook normally uses and just adapt it for this purpose.

MR. PARASHARAMI: Right. I guess the -- the predicted home location technology is existing technology. The process of searching for this, obviously, is not something it ordinarily has to do --

THE COURT: I understand. You're just tailoring existing search protocols for this project. Just like if I were Procter and Gamble, you would be tailoring it for Procter and Gamble.

You're just using pre-existing -- I want your assurance this is not a new, different or unusual software. This is what Facebook does in the ordinary course of business to get this information.

MR. PARASHARAMI: I understand your question, your Honor. I think it is accurate to say that the underlying information of predicted home location is part of our course of business.

The searching of it. The substantial engineering time needed to actually get this information pulled, the pulling of an email list, is not part of our ordinary course of business.

THE COURT: I understand. Of course not. This is



litigation. This isn't -- class action trials don't happen every day, even for Facebook.

Now, for the IP addresses, how are you going to harvest those?

MR. PARASHARAMI: That specific of how to do it is beyond my knowledge, but my understanding --

THE COURT: Just generally. What do you understand is going to happen?

MR. PARASHARAMI: I think we have data and we are going to look at that data. I mean, at that level -- the engineers understand it and, as I say, I think we can do it with reasonable speed.

THE COURT: All right. Okay. So we're going to set a target date of May 25th for this. All right?

Now, if there is any extraordinary problem, you can let me know, like, the day before and we'll see what we can do.

MR. PARASHARAMI: Your Honor, just to try and -- I think that given this time frame of the two months, I -- that has been -- you know, we're going to have to start on it. I just do not know that starting today, we can get it done by the 25th.

I would ask, rather than us coming back to you on the 24th or 25th -- the 24th is three days from now, and saying --

THE COURT: Well, your declarant says they -- we're talking about what was in the declaration. He said he could do



it by the 25th. What's the problem?

MR. WILLIAMS: I think they said they already started.

MR. PARASHARAMI: Yeah. Started on, I think, a different time frame. So I just don't know. I think, your Honor, if we --

THE COURT: It's a mildly longer one. I mean, if you were doing six months, this is just now three months shorter.

MR. PARASHARAMI: Yeah. If we have to restart our work in order to do it, then that might expand the time.

THE COURT: I will be surprised, but you ask and figure that out. But all we're doing is the -- literally the only thing we're doing is, apparently, starting a little bit earlier than you might have. That's all. Maybe they did start earlier. Who knows?

MR. PARASHARAMI: Right. So I'm saying we would have to start the search now, as opposed to having already tried to start work on this.

THE COURT: All right. May 25th is going to be the target date. You let me know if there is any problem with that. We're going to shoot to get everything out by May 30th. Okay? That will give us 40 days before trial.

All right. Now, I do want to -- then you all can raise any other issues you want to, but let's just go over the long form notice as amended in the, what is it, reply filing,

Mr. Williams?

MR. WILLIAMS: We filed a declaration on Friday afternoon.

THE COURT: Yes, that one. I want to use that one. Okay.

MR. WILLIAMS: I think it's docket -- the red line is 381-2, if that's helpful.

THE COURT: Let's actually take the original un-red lined one, 381-1, which is plaintiff's revised long form notice. Let's just go through it.

There are a couple of changes I'm going to make and then we can discuss whether other changes need to be made as well. So on Page 1, that all looked fine to me.

Mr. Parasharami, any problems with that?

MR. PARASHARAMI: I'm sorry. You're looking at 380 --

THE COURT: 381-1, the long form notice, called Exhibit A.

MR. WILLIAMS: 381-1 was filed on May 18.

THE COURT: May 18.

Maybe you two can share?

MR. WILLIAMS: That's fine. I don't have my winning case notes here.

THE COURT: Exhibit A.

MR. WILLIAMS: 381-1 is the clean version. 381-2 is



the red line.

(Whereupon document was tendered to counsel.)

MR. PARASHARAMI: Oh, thanks. Appreciate it.

THE COURT: Okay. Page 1 seems fine.

Any problem with that, Mr. Parasharami?

MR. PARASHARAMI: Your Honor, we -- we do, you know, for -- you know, I guess -- I think an appropriate -- especially since we have some time, but what I would propose is that we submit --

THE COURT: No, we're just going to do it now. Let's get this thing done.

Look, this is one of my oldest cases. Okay? We can't keep pushing things down the road. The time for trial has come. You're here. I'm here. I've got a million other things to do. Trust me, I have a lot more than you do. Let's just finish this now. Okay?

MR. PARASHARAMI: I appreciate, your Honor --

THE COURT: So any problems that are not in your brief? Any objections to Page 1?

MR. PARASHARAMI: Yeah. Our concern is that the use of the phrase "biometric data" is inaccurate because it doesn't appear in the statute. It's not what the claims are --

THE COURT: What do you want, "biometric information"?

MR. PARASHARAMI: "Identifiers," your Honor. That's



the phrase in the statute and that's the -- that's the phrase that they are -- that the plaintiffs are actually litigating.

THE COURT: This has no legal interpretive effect. You understand that? So this is just telling people in the world in a practical and reasonable way what the case is about.

I think that idea of identifiers, it's not going to tie your hands. It's not going to tie anybody's hands. It's certainly not going to tie my hands. We just want to communicate to people in a way that they understand.

I'm going to overrule that. "Data" is fine. That is not an interpretation of BIPA. It is not meant to be a statement of law. You know that. This is just telling folks in the world: Hey, maybe I should do something. Okay?

MR. PARASHARAMI: I think that the problem is it misstates the claims, and Rule 23(c)(2) requires an accurate statement of --

THE COURT: It is accurate, Mr. Parasharami. Trust me. I have been writing Facebook order after Facebook order for the last two months. All right? This thing is going to get done.

So if you want to say "information" because you don't like the word "data," that's fine. It does not have to slavishly follow the statute to be accurate and informative.

Now, what do you want to say if you don't like the word "data"? Would you prefer to say "information"?



MR. PARASHARAMI: Umm --

THE COURT: "Materials"?

I don't know why the word "data" is objectionable, but if you don't like it, I will entertain a substitute.

MR. PARASHARAMI: Yeah. I --

THE COURT: "Stuff."

MR. PARASHARAMI: Oh, no. I --

THE COURT: "Your face," how about that? "Stored your face."

MR. PARASHARAMI: Yeah, I don't think that's quite right. I think -- do we prefer "information"?

MS. GOLDMAN: Yes.

MR. PARASHARAMI: "Information."

THE COURT: "Information," okay.

Mr. Williams, do you have any problem with that?

MR. WILLIAMS: No.

THE COURT: That will be changed to "information."

Okay. Anything else on Page 1, Mr. Parasharami?

MR. PARASHARAMI: Yeah. I think -- I think throughout where there are references to "in Illinois," and this is a global problem with the notice, it should refer to "residents."

I think that, you know, the Court has said in its class certification order, the order granting class certification, that the class consists of Illinois residents; that it is not a

class of Illinois non-residents.

MR. WILLIAMS: That's inaccurate.

MR. PARASHARAMI: Well, on Page 13 it says -- the order says that this is not a class of Illinois non-residents.

MR. WILLIAMS: Your Honor, what he's referring to on Page 13 of the order -- first, the class definition is:

"Facebook users located in Illinois for whom Facebook created and stored a face template after June 7, 2011."

That's on Page 15.

Page 13, that Mr. Parasharami is referring to, is a page where your Honor was discussing the extraterritoriality issue and actually -- and the Avery case, which -- in which case the issue was plaintiffs who brought suit under an Illinois statute, but lived outside of Illinois. And you are distinguishing that set of circumstances --

THE COURT: I remember that all quite clearly.

Why don't we do this? I did say "located." Why don't we say, "If you are a Facebook user located in Illinois"?

MR. WILLIAMS: That's fine.

THE COURT: Okay? Make that change throughout. Okay? So, for example, starting in that bold language at the top and then elsewhere. Okay?

MR. PARASHARAMI: Your Honor, just on that point. It does seem like based -- the order said none of the class



members are non-residents, and I just think that it could be misleading to people, to the extent that if they believe that -- that there is some sort of broader criteria, you know, located in what captured your O'Hare example. And I think that would be very confusing to potential recipients of this.

THE COURT: I think that's -- I'm not worried that that's going to be confusing.

So we'll -- we'll meet you halfway there, Mr. Parasharami. We will say "located in." Mainly to stay consistent with the definition that's in the next paragraph.

Okay. Any other concerns about Page 1?

Mr. Williams, you need to just take notes or have somebody on your team take notes so we can make all this good. Okay?

All right. Anything else?

(No response.)

THE COURT: Page 2 is just the Table of Contents. Anything there?

MR. PARASHARAMI: So, no, we don't have a problem with that.

THE COURT: Okay. Page 3. I am changing Section 1 to -- we're going to delete entirely the sentence, "The trial will decide." Okay?

So it should go from bracket date to my name. Take that middle sentence out.

And then in the second line "You have legal rights," say



"Before the Court holds a jury trial." All right? So add "jury" there and take out "the trial will decide" line.

Mr. Parasharami, any concerns about Page 3?

MR. PARASHARAMI: So I guess globally we've covered the change from "data" to "information"?

THE COURT: All right, yes. That will be made throughout, along with the "located."

Okay. Anything else?

MR. PARASHARAMI: Yeah. I think in the last sentence of 2, we think it's --

THE COURT: 2? Okay.

MR. WILLIAMS: Section 2.

THE COURT: Yes.

MR. PARASHARAMI: Section 2.

THE COURT: Yes.

MR. PARASHARAMI: We think it's important to instead of repeating the phrase about the "stored biometric data without prior consent," to identify the statutory requirement, which I'll agree is part of the requirement of being aggrieved by a violation of the statute.

THE COURT: All right. So what are you asking?

MR. PARASHARAMI: To delete -- where it says "any person in Illinois," and then delete "from" through "consent to aggrieved by a violation of the statute."

MR. WILLIAMS: I'm not sure I understand.



THE COURT: I don't see the word "from." Where is that? This is Paragraph 2, "What is this lawsuit about?"

MR. PARASHARAMI: So we would change after "BIPA allows any person in Illinois from."

THE COURT: The last sentence, I see. "BIPA allows any person in Illinois."

MR. PARASHARAMI: "Aggrieved by a violation of the statute," is what we would say in place of "from" through "without prior consent."

THE COURT: Can we just drop that last sentence entirely? Do we really need it? It seems a little duplicative of anything else.

MR. WILLIAMS: The reason we had it in there is because we felt we needed to actually explain the damages, the potential. But if that's out, we're comfortable with it.

MR. PARASHARAMI: We're fine with deleting the sentence.

THE COURT: All right. That last sentence will be deleted. Let's take that whole thing out and make it shorter anyway.

Okay. Anything else on Page 3?

MR. PARASHARAMI: I think -- I think in the first bullet on the response to -- the response No. 4, where it says, "who have been tagged in photographs and, thus, had face templates created."

I'm not sure that's entirely clear that that's right. And I would just cut "who have been tagged" --

THE COURT: How about if we drop all those bullet points? For notice purposes, do they really need --

MR. PARASHARAMI: That's fine.

MR. WILLIAMS: Don't need them.

THE COURT: All right. All the bullet points are out. All the little dot things will be out. Okay. That's good. All right. So that takes care of that.

Page 4. Any concerns, Mr. Parasharami?

MR. PARASHARAMI: So, again, the -- I think we're replacing "biometric data" with --

THE COURT: That's going to happen universally. So don't worry about that.

(Brief pause.)

THE COURT: All right. Nothing this?

MR. PARASHARAMI: Yeah. I -- we would like to supplement, and I just don't have language here, but six with -- you know, because I think if I understand right --

THE COURT: Six, okay. Yes.

MR. PARASHARAMI: Mr. Williams and I are probably going to submit after this a joint document that contains our -- our views of what this should look like for the Court's approval. So just -- you know, I think that might be a good way to proceed.



But with that, we want to provide a --

THE COURT: Can I tell you what I used to do when I was on your side of the case? I would just say: We disagree entirely and consider ourselves to be as innocent as the new lambs. I mean, how much more do you need to say?

MR. PARASHARAMI: I think with respect, I appreciate that, but we would like to communicate our point of view.

Can I -- I guess I can read into the record what our view would be for -- for six and --

THE COURT: I'll tell you what. Just work it out today.

MR. PARASHARAMI: Is that all right, your Honor --

THE COURT: Any reasonable statement. They can say whatever they want.

MR. WILLIAMS: One point I'd like to make there.

THE COURT: Yes.

MR. WILLIAMS: It's their position they want to say whatever they want, that's fine.

What they do want to add, though, which we talked about yesterday, which was that they have a current petition with the Ninth Circuit pending under 23(f). And I explained that, look, it's not in the Ninth Circuit. It's a petition and it's not -- have relevance to any person that is going to be reading this for notice purposes.

And so we didn't think that that had any role in --



THE COURT: Well, I agree with that. You can just say -- we're talking about the merits here, okay, not procedural things. So just whatever you want to say on the merits.

MR. WILLIAMS: They can say whatever they want to say.

THE COURT: They can do whatever they like. If you have any objections, let me know. Okay?

Let's get that done by tomorrow -- I would like to have this back first thing tomorrow morning.

MR. PARASHARAMI: Your Honor, with that in mind, I think -- and we have been negotiating over the weekend. I think there might be some value in -- and I think we agreed on a lot of things, Sean, I think it's fair to say.

MR. WILLIAMS: Except last night wasn't quite an agreement.

THE COURT: Just talk to the Court not to each other. Talk to me.

What's the issue?

MR. PARASHARAMI: Your Honor, I think it might be appropriate for us to -- you know, if we can agree on certain other changes to this, we would put in it a red line for your Honor --

THE COURT: You can do whatever you want, but this is the baseline. Okay?



MR. PARASHARAMI: Sure.

THE COURT: If you want to riff on it some more, that's fine, as long as everybody agrees.

MR. WILLIAMS: And the changes that your Honor has suggested right now, we're fine with those.

THE COURT: Those are all mandatory. Okay? They're not to be negotiated.

Now, I do not want to see 15 other topics of this agreement. This is your time. So don't go home and think: I'm going to add 20 more points. We're getting this done now.

Now, I will let you negotiate your insert. That's fine. Okay? Now, if there is anything else you both agree on, that's fine, too.

MR. PARASHARAMI: And is that true throughout the document?

THE COURT: That's through for the entire notice. Okay? This is it. This is your show time.

MR. PARASHARAMI: Appreciate it, your Honor.

THE COURT: Okay. Anything else on Page 4?

(No response.)

THE COURT: All right. Page 5?

(Brief pause.)

THE COURT: Now, I have to say for number ten, I understand there is not going to be a website that automatically tells you. That's fine.

But I think the wording of this properly captures the fact that they will be notified later after all of the checking mechanisms are put into place and it's determined. So I don't have a problem with that.

MR. PARASHARAMI: Your Honor, on this we feel very -- there is not going to be some process by which -- that can inform potential class members accurately whether they are class members or not. So that's a pretty important point.

THE COURT: I agree with that. But I think this notification just says go to this website, type your name in and we'll get back to you.

It doesn't say we're going to instantaneously determine whether you're a class member or not.

MR. PARASHARAMI: I think that -- at least if I were a class member reading that, I would think that by putting my information in, I would get some return at some point on whether I'm a class member or not. And that is typically --

THE COURT: It says you will be notified.

MR. PARASHARAMI: So that -- that essentially almost never happens in class actions. To my mind -- and I do a lot of class actions and class action notices. To me, this is both unheard of and, frankly, totally impractical. I don't think it's necessary to -- for purposes of understanding whether somebody should opt in or opt out.

I think the other problem with that is that if somebody is



choosing whether to exercise their due process right to opt out of the class, they might believe they could go to a website and actually provide that information.

This is -- at the end of the day if there is a trial in the case and, you know, a final resolution, there would always need to be a claims process in order to determine who is in the class. So I think this is wholly misleading.

I think striking it is -- would be useful. And, you know, I think we have --

THE COURT: Well, all right. I don't agree with any of that, but in the interests of expediency, can we just drop it?

MR. WILLIAMS: I don't think that it's misleading at all. I think it's helpful.

THE COURT: Why do we need it? Why do we need it?

MR. WILLIAMS: The only reason that we need it is so that class members or potential class members can go to the website and find out more about the case and whether or not they may be part of the class. It's more informative than anything else.

MR. PARASHARAMI: But I think throughout this document you're going to have places where you say: For more information about the class action, you know, look at this web page. This is specific about class membership.

MR. WILLIAMS: Your Honor, if you think -- if you



think it's --

THE COURT: Hold on, everybody. We've got plenty of time here.

Now, let me ask you this. Are you looking to harvest something from this cite that you need?

MR. WILLIAMS: No.

THE COURT: Any data or anything like that?

MR. WILLIAMS: No.

THE COURT: Okay. I thought maybe this was an effort to get extra clarity on who might be -- but it's not.

MR. WILLIAMS: Well, the -- the website and people logging in or putting their name and information in there and getting info about whether or not they may be in the class, that it's more helpful to the notice recipient than to us.

MR. PARASHARAMI: This is a website that can never really exist because there won't be a process for checking them against -- there is no class membership list to check against. And that's why I say I think it was -- and 11 is kind of the same way. They say "you will be notified" --

THE COURT: Slow down here. We are going to determine who has a face template. There is just no question. That is going to happen. It may not happen now for the notice period, but it is going to happen when we get to the claim stage should that day ever arise.

MR. PARASHARAMI: So I think that's a totally



different process and that including language about some -- you know, about some website now would be misleading because it would imply that you could find out before the claim is processed.

I agree that, you know, at the end of the day there will be a claims process. That should be delineated later, not in this notice.

It would be misleading to tell people -- I assume that the blank is a -- so if I may? That the blank is going to be the class notice website. That's typically what the blank refers to.

But that notice website, as -- you know, when somebody gets an email, if they click on this link, there is not going to be anything on that website that allows them to actually get information about whether they are in the class or not during the opt-out period.

And the whole purpose of notice is for people to be able to decide whether or not to opt out. That's sort of the touchstone of due process. So this is not just kind of a side issue. This is actually pretty important.

And, you know, I -- I think if we're going to, you know, take this seriously, we have to got to not include misleading information like this.

MR. WILLIAMS: I think I understand the issue now, your Honor. I had not heard this before.

I think that what Mr. Parasharami is suggesting is that -- that this -- this suggests that you can go to a website now and determine if your name is going to be among those.

And I agree, that that's not -- I don't think that that's necessary. There won't be any information populated in there, in that website now about whether or not your name is --

THE COURT: I started off by saying yes. It says, we'll let you know later. But I thought it was to help define specifically people who might get missed otherwise, but you said no. So if you want to put in a general, "for more information, see..."

MR. WILLIAMS: "For more information." We can do that.

THE COURT: How about that?

MR. WILLIAMS: Yes.

MR. PARASHARAMI: I think that's the kind of thing that we could readily negotiate.

THE COURT: All right. So why don't you just redo 10 and 11 and just make it: For more information, please see your cite. Okay?

MR. PARASHARAMI: Your Honor, I do think in 11 there is the potential to mislead people. And 10 as well, for that matter. But certainly in 11, in talking about whether you're in the class or not.

Just uploading one photograph might not be enough to put



you in the class. I think there should be some -- some qualifier, like, enough photographs just to make it clear.

THE COURT: You two try to work something out. I mean, I think 10 and 11 could probably just be one item.

MR. WILLIAMS: Can I be heard on this point, because it's one that we discussed yesterday.

THE COURT: Sure. Okay.

MR. WILLIAMS: Whether or not a person uploads enough photographs for a template to be created is an issue that a notice recipient is not going to understand. Frankly, it is -- I don't even know that it's accurate.

So what defendants are suggesting is that in some instances you may have to upload more than one photograph or there needs to be more than one photograph of you in order for a template to be created.

That issue is going to come out at trial in one way or another. It's not necessary here at all.

THE COURT: I agree. Look. The way to approach notice is you have to have had at least one photo uploaded. That may not be enough. We'll see. Have to dispute this at trial maybe.

MR. WILLIAMS: Right.

THE COURT: But let's not -- we're not going to get into that now. Okay.

I think all of this can probably just be for more



information and to help you think about your rights, you know, something along those lines, and whether you want to stay in or stay out, you can go to this website or call you.

MR. WILLIAMS: That's right.

THE COURT: Not me. Call you. Okay? I'm not sure we say that enough actually. I know it's at the end, but think about maybe in the beginning when you mention my name, "Please do not call the Court." Ms. Clark and I would be very happy. Okay.

MR. WILLIAMS: Will do, your Honor.

THE COURT: All right.

MR. PARASHARAMI: This is something we can probably work out with Mr. Williams, but for -- if we're on number 12, I think that would be a good place to say "Do not contact Facebook or the Court."

THE COURT: That's fine. You can put that in, too. That's perfectly fine.

In fact, that probably is not a bad idea. Why don't you say, "Please do not email or do anything to Facebook because it will not be seen. You need to go through this process."

All right?

MR. PARASHARAMI: Right.

THE COURT: All right. Page 6. Oh, I do have -- the exclusion process, I think, is not adequate. We'll get to that in a moment.



Anything up to -- in the first paragraph or Paragraph 14 on Page 6?

MR. PARASHARAMI: I don't believe so, in the first paragraph.

THE COURT: Nothing, okay. Paragraph 14.

MR. PARASHARAMI: Are we on the second paragraph?

THE COURT: Yeah, the one that's numbered 14.

MR. PARASHARAMI: Yeah. So we didn't have an issue in the first paragraph.

I guess on the second paragraph, I think that the last sentence of that paragraph is a little bit confusing.

THE COURT: "If you exclude."

MR. PARASHARAMI: It sort of presumes why somebody might exclude themselves, and it seems to give them, you know, legal advice, which I think is probably not the function of a class notice.

THE COURT: Why don't we just do this, "If you exclude yourself, you should talk to your own lawyer soon." How about that?

MR. WILLIAMS: That's fine with us, your Honor.

THE COURT: Let's just do that.

MR. PARASHARAMI: I think that's fine.

THE COURT: Okay? All right. So, "If you exclude yourself, you should talk..."

Now, 15, Mr. Williams, you went from the 21st century to

the 19th when you want to opt. I think U.S. mail is just not -- not the right technique. You need to have a click "opt me out," a -- you know, something easy. Do not go to a different website. Just something that can say, "Please exclude."

MR. WILLIAMS: We talked about that with the claims administrator over the weekend and this morning and that can be electronic.

THE COURT: All right. I think U.S. mail should be a last resort, if there at all. Okay? Because it's just -- in this day and age, and particularly for this case, it's not that suited. All right?

MR. WILLIAMS: Yes.

THE COURT: All right. You work that out.

Okay. Page 7? Anything on Page 7, Mr. Parasharami?

MR. PARASHARAMI: Yeah. My understanding is that plaintiff's counsel had some changes on their communications issues on Page -- on 16.

THE COURT: On which one?

MR. PARASHARAMI: On number 16, but I suspect we can work that all out.

MR. WILLIAMS: Oh, on 16 we're just going to change the telephone numbers. We have an 800 number that we would like to --

THE COURT: Oh, okay. Good. 1-800 number.



MR. WILLIAMS: Each firm has an 800 number that is -- has people trained to answer questions related to the notice or questions from potential class members.

THE COURT: All right. Okay.

All right. Anything on Page 7? I do -- I'm going to change the trial section, but we'll -- anything before that, Mr. Parasharami?

MR. PARASHARAMI: No, not -- no.

THE COURT: On the trial, just -- let's have that entry sentence read, "The Court has scheduled a jury trial to begin on July 9, 2018."

Just take out the rest. End after 2018.

Okay. Anything else on Page 7, Mr. Parasharami?

MR. PARASHARAMI: No, not on -- not on the -- one second.

THE COURT: Anything on Page 8?

MR. PARASHARAMI: Sorry. I'm just comparing.

THE COURT: Yes, that's fine.

MR. PARASHARAMI: No.

THE COURT: Okay. Now, you two finish those little things you're going to work out. Get it to me by tomorrow morning and then tailor the short form to correspond to all the changes we made to this one. Okay?

MR. WILLIAMS: Will do.

THE COURT: All right. Anything else I can help you



with on notice?

MR. PARASHARAMI: I think we do want to talk about timing again, your Honor.

You know, we made -- I mean, first of all, obviously, we will do our best and we will keep the Court informed about creating the list of notice recipients. Obviously, as your Honor said, we will target the 25th.

We make clear in the declarations that we filed that a -- that the news feed would take a week longer than that after the list is completed and that the jewel notifications would take two weeks longer than that. Just so your Honor is aware of that.

THE COURT: Why is that?

MR. PARASHARAMI: That was -- that was for the computing time and resources, engineering resources that would take to do it. We asked how long would that take, and that's what we were told.

THE COURT: Two weeks to post something on a jewel?

MR. PARASHARAMI: Yeah, because this isn't -- it's not something that we have just set up. It's not -- again, it's not like you press one button.

I appreciate that buttons are pressed, but lots and lots of buttons are pressed here.

THE COURT: How can it take two weeks to do that? I mean...



MR. PARASHARAMI: I mean, that is --

THE COURT: I didn't get that. I find it little counter-intuitive, to be honest.

But why does it take -- the jewel mechanism is set up. You've just got to populate the text box. Why does that take two weeks?

MR. PARASHARAMI: I just don't think that's how it works. And we can talk to the engineers and get you more detail. In the -- we had, as you know, almost no time to deal with these issues.

THE COURT: I really disagree with that characterization. It's just not right. You had plenty of time. We can take it down to 30 days and you still have plenty of time. So this is not -- and particularly for an online company that moves with alacrity when it chooses to in other circumstances, I find the time protestations to be a bit hollow.

Now, what I would like to do is understand why it takes two weeks to populate a jewel content. I don't get that. Do you know?

MR. PARASHARAMI: No. We talked to our engineers and asked them what would it take and that is what we were told.

THE COURT: I need more detail on that. I am skeptical, quite skeptical that Facebook cannot turn on less than two week's notice to post a jewel. That's what you're

telling me.

I'm going to hold you to that. And I'm finding it very, very hard to believe that there is an iron-clad algorithmic online law that Facebook cannot do a notice on less than two week's prep time. I'm very skeptical.

Now, maybe that's right, but I'm going to need to see some proof. I am going to remember that you told me that, Mr. Parasharami.

MR. PARASHARAMI: I appreciate that, your Honor. I wouldn't tell you that if I did not think --

THE COURT: You're not able to tell me the details why, which makes me concerned.

MR. PARASHARAMI: Yeah. Again, in sort of the time frame for trying to brief these issues in the last two to three days, or whatever it's been, we tried to get quick answers to how to accomplish this task.

THE COURT: All right. I want to see a detailed declaration from the engineer who does this explaining to me that it is literally impossible for Facebook under any circumstances to post a jewel notification on less than 14 days notice. That's what I expect to see. You get that to me by tomorrow at 5:00 p.m.

Now, what about the -- you said it took a week for what?

MR. PARASHARAMI: For the news feed.

THE COURT: I want the same declaration for the news



feed. I do not want generalities. I want specific understandings. And I want that person to say that they have never been able to do this before and it's literally impossible for Facebook to post anything in a jewel notice on less than two week's notice no matter what. And it is impossible for Facebook to post anything in the news feed on, what is it, less than seven days. That's what I expect to see.

MR. PARASHARAMI: I think that that's a -- I'll just be direct. I think that's a bit unfair. We asked for the best estimate of the time it would take and --

THE COURT: We're not talking about that. I'm talking about your representations to the Court, Mr. Parasharami, that Facebook could not do this on less than two week's time. I want to see the evidence for that.

That's what we're talking about, not the overall time in the case. I want to see the data behind that representation.

MR. PARASHARAMI: I just want to be clear --

THE COURT: I want to have an engineer tell me, under penalty of perjury, that it is literally impossible for Facebook to do that on less than two week's notice, because I am deeply skeptical.

MR. PARASHARAMI: So I want to be clear. I don't think I'm representing the words "literally impossible." What I was representing is what I understood is the time that they forecast it will take.



Do they -- I think it's not like it's been -- I just don't know the answer to that. I think that --

THE COURT: You told me two weeks. Now --

MR. PARASHARAMI: That's our best estimate. I think it's a legitimate --

THE COURT: I'm not going to accept a best estimate. When you tell me, as you did, that you cannot do it, no way, no how, on less than two week's notice, I want to see the evidence for that. I don't believe that's true. Now, it may be, and I may learn something, but I'm skeptical that that's true.

You get that to me tomorrow at 5:00, and you get the news feed one at the same time.

Anything else I can help you with?

MR. PARASHARAMI: On that issue, your Honor, i would just ask if I turns out -- and I'm not trying to be difficult here. If it turns out we can do it quicker, we will try, but I -- and then -- and we'll learn that.

But we gave the Court the best information we had at the time we filed these declarations, you know, at the Friday 5:00 p.m. deadline.

THE COURT: We shall see, Mr. Parasharami.

Anything else I can help you with, Mr. Williams?

MR. WILLIAMS: Just one point, your Honor.

THE COURT: Yes.

MR. WILLIAMS: Actually two.



To the extent that you're satisfied with whatever you get from Facebook on those issues, it shouldn't stop whatever they can do quickly should get out. We can stagger some of those issues, to the extent the Court is willing to do that.

THE COURT: I will take a keen eye to the timeline.

MR. WILLIAMS: And the next issue is just one I'm anticipating due to correspondence I have had with defendants over the last few days.

So when we were here last a few weeks ago, we asked you about your standing order on civil trials and the timing of the obligations of the parties in exchanging information so that you had the information that you needed within, I think it's 14 days of the pretrial conference.

THE COURT: Let me -- remind me when that is?

MR. WILLIAMS: It's June 14th. Pretrial conference is June 14th.

THE COURT: Oh, okay. Yes.

MR. WILLIAMS: So that requires you to have the documents that you need by May 31st.

THE COURT: Yes.

MR. WILLIAMS: We met-and-conferred on May 2nd or 3rd regarding, you know, Exhibit Lists, Witness Lists, things that are going to require us to really talk about to get the documents before you in the form that you need them.

Last week we -- we agreed to exchange that information on

May 17th or 18th at the latest and plaintiffs have served their Motions in Limine, the Exhibit List, the Witness List and other materials to invite correspondence and discussion on those matters so that we can get them, you know, together.

We got a response from Facebook saying that they needed another five or six business days to do their exchange. So we haven't received anything other than Motions in Limine from them yet and so there is no work that can get done.

Last night I got an email from Facebook saying that they may raise this issue with you to get more time to do the exchanges, but they would like to do it in a way that doesn't affect the trial date, but it might affect the date on which you get the materials in order to make decisions about admissibility and things of that nature.

THE COURT: How many do you have? For example, how many Motions in Limine do you have?

MR. WILLIAMS: Well, your limit was eight. We served --

THE COURT: You hit the limit?

MR. WILLIAMS: Yeah. We served --

THE COURT: You hit the limit.

MR. WILLIAMS: We hit the limit. They served six. I think there are probably three of those that we'll work out.

THE COURT: I know you know, because you're an experienced trial lawyer, you both are, it's just evidentiary



objections. Okay? It's not -- they are not mini summary judgments. We are not covert Daubert motions. It's just: This category of documents or this type of testimony should be excluded because --

MR. WILLIAMS: We're true to that.

THE COURT: -- it's character evidence, or something like that. You had eight of those.

MR. WILLIAMS: We were true to that. I think that once --

THE COURT: Can you give me a sample? Just a high level -- what are some of the issues that's your evidentiary problems?

MR. WILLIAMS: One of the issues is, for example, the admissibility of documents related to the Irish Data Protection Commission, which had audited Facebook in 2011 and 2012, particularly about the privacy issues and the way they were collecting biometric data.

THE COURT: All right.

MR. WILLIAMS: That's one thing we expect to be an issue.

THE COURT: Okay.

MR. WILLIAMS: The next issue is the acquisition of face.com, and issues around that. They have taken the position in pleadings that the facial recognition data --

THE COURT: I just wanted a flavor. That's good.



Okay. Sounds like you did the right thing on the motions. You'll have plenty of time to argue that.

MR. WILLIAMS: But I think -- we did hit the limit of eight, but I do think that we will be able to work out some of them so that it comes down to maybe five --

THE COURT: All right.

MR. WILLIAMS: -- or six.

THE COURT: Okay.

MR. WILLIAMS: But the Motions in Limine are not the issue. It's the other things that have to be done. The Jury Instructions, the -- the proposed Jury Instructions, you know, the Exhibit Lists on negotiating admissibility and what that's going to look like.

If we're not getting the exchanges from Facebook, we're, you know, negotiating with ourselves and the time frame for us to reach those agreements is going to get much shorter.

THE COURT: Well, let me just jump in. I have been thinking about Jury Instructions. Now, I'm presuming Illinois does not have a model instruction for BIPA.

MR. WILLIAMS: No.

THE COURT: So this will be one of those rare circumstances where we're going to craft one. I don't think that will be terribly hard. I think that can be done in a page or two, maybe, and maybe some terms defined, as we do in the Jury Instructions. I'm not sure that's necessary, but I think



we could do that.

And then there will be an issue on damages. Zero damages, 1,000 or 5,000. And I presume no one is attempting to prove actual damages.

MR. WILLIAMS: That's right.

THE COURT: Okay. So it's going to be statutory damages.

MR. WILLIAMS: That's right.

THE COURT: Okay. All right. So that's not an insurmountable task between now and June 14th.

MR. WILLIAMS: Between now and May 31st, because that's the date that we have to submit all the pretrial materials --

THE COURT: Ten days from today.

MR. WILLIAMS: -- including the trial brief.

There is a lot to be done. And unless it's a two-way street, it's not going to get done. And we don't want to be jammed in making those decisions, as they now have all of our materials to just sit on and sort of evaluate and provide us with their responses or their positions whenever they get comfortable with it.

THE COURT: All right. Let's hear from Facebook. Mr. Connelly.

MR. CONNELLY: Judge, I'm going to accentuate the positives. We're getting closer to trial, as you might expect.

You know, that's --
THE COURT: These things happen.
MR. CONNELLY: You have to search a little bit for the positive, but there have been good faith communications between the parties trying to narrow the issues.
The -- and the deadline for both parties is May 31st to be done with it. That would then let you have all of the materials two weeks in advance of June 14th.
THE COURT: Yes.
MR. CONNELLY: What Facebook has been suggesting is, look, let's keep talking, but we're getting crunched. We'll all do a better job if rather than -- rather than submitting everything to the Court on May 31st, give us three extra business days, which would push it out til June 5th.
Now, full disclosure, Judge --
THE COURT: Three actual business days.
MR. CONNELLY: Yeah. We would like to have the filing on June 5th. Full disclosure that the Court can easily back into itself. That tightens it up a little bit in terms of when the Court gets everything filed on June 5th for the June 14th hearing, but that's our suggestion.
Again, not for purposes of delay, but really, frankly, so that we can -- as you can understand, a case of this magnitude, there are certain layers of review and getting client approval, so that we can continue to talk with the Plaintiffs -- I'm



sorry, with the other side in total, as far as let's see how much we can hit common ground on.
THE COURT: And this would be to make my life easier.
MR. CONNELLY: Yours and ours both.
THE COURT: All right. June 5th?
MR. CONNELLY: That's our suggestion.
THE COURT: All right. I can accept that, 5:00 p.m. California time June 5th. Just have it all in by 5:00 p.m. California time on June 5th. And this is with an eye towards streamlining the issues, the extra time.
MR. CONNELLY: One last point, Judge, unrelated to this issue, but as long as I'm up here.
THE COURT: Yes.
MR. CONNELLY: And I think it's pretty clear that the Court has denied or plans to deny Facebook's request to stay the proceedings while we have the petition before the Ninth Circuit. I just --
THE COURT: I haven't even gotten the opposition to that yet.
MR. WILLIAMS: The opposition is due today.
THE COURT: I have not taken a look at it.
MR. CONNELLY: I'm sorry.
THE COURT: I have so much to do. Until things are submitted, I really don't -- I just -- I wish I had time to kind of read the things as they come in. I don't. It's just



not practical for a district judge.
MR. WILLIAMS: Can I make one more point, your Honor, because there is one expectation.
THE COURT: Yes.
MR. WILLIAMS: You know, your class certification order, obviously, focuses on the face templates. And the -- the number of face templates that Facebook has either created in Illinois is obviously going to be at issue in the case, one of the primary issues, a number of them.
We asked for that number in discovery many times. We actually came to the Court at one point to -- on a Motion to Compel and the Court ordered to us meet-and-confer, and the promise was they would get something to us in the form of a stipulation what the number of face templates are. They have the number. We think it's somewhere around 7 million, maybe slightly less than that.
But I don't see how we can go forward until they produce that number. And it doesn't have to be today, but your Honor is going to need it. We're going to need it.
We've asked for it. We're entitled to it. They have it. It may come up in papers before you, but I don't see any reason why it's not something that hasn't been provided, you know, forthwith.
THE COURT: So it's not subject to some fact disputes at trial?



MR. WILLIAMS: How many face templates they have?
THE COURT: Yes.
MR. WILLIAMS: I don't think so. I don't think it's -- the number is really going to be a fact dispute, but because we asked for the number, they have it. It's kind of a discovery issue that never got resolved.
THE COURT: I take it you want to say in opening statement -- you want to use the number in opening statement? Is that the issue?
MR. WILLIAMS: I may.
THE COURT: Okay. I thought it was disputed, the number of templates.
Is that right, Mr. Connelly?
MR. CONNELLY: Well, yes. I think -- that's a fair statement.
THE COURT: All right. Well --
MR. CONNELLY: Although I appreciate what counsel is saying.
Again, I haven't been personally engaged in this process. I will take a deep dive into it to find out whether or not that number can be made available and if not, why it can't be made available.
THE COURT: To be honest, it actually -- as you have suggested with an eye towards streamlining pretrial prep, if that's something you can just stipulate to, you can just make

it a stipulation of fact. Okay? That would -- if it's not controversial and you all are happy with it, let's just do that.

MR. WILLIAMS: It will be controversial because the number will have some impact on the damages issue, which is why they haven't -- in my view, why they haven't produced the number even though we've asked for it a number of times.

Ultimately what you'll hear from us, your Honor, is that to the extent that they are unwilling to provide the number of face templates, then our position will be that they should not be able to present evidence to the Court or to a jury that it's anything less than the number of users in Illinois.

THE COURT: Well, I think that's going a little far now. Why don't you two see what you can work out?

I was under the impression that the -- populating the exact count of templates was something that may turn on the evidence at trial. If that's wrong, you can tell me. If it's right, you can certainly say "we believe it's millions" in the opening and go from there. Whatever you want.

You can make your argument. There may be a consequence if you overstate, but that's up to you.

MR. WILLIAMS: Which is why we asked for the number in discovery and they haven't produced it.

THE COURT: Okay. Well, you two will -- why don't you address that? If you can't resolve it in the next couple



days, just let me know.

MR. CONNELLY: Two other, hopefully, quick items from Facebook, one from me and one from Archis.

THE COURT: Yes.

MR. CONNELLY: I think that the hearing on the request for a stay is set for June 21st. And I would suggest in order for everybody to keep that July 9th date, if it's possible, if it's convenient for everyone, to try to move that hearing a little up, have it sooner than June 21st, if that's possible.

I appreciate that the Court hasn't had a chance to take a look at all the papers, so I'm just -- I'm raising that as a possibility.

THE COURT: I haven't looked at them all. I certainly haven't gotten an opposition.

If you two want to propose an earlier date, I will consider it. I have another trial coming up -- actually, I have two other trials coming up.

THE CLERK: June 14th.

MR. WILLIAMS: I thought it with as June 14 as well, which is --

THE CLERK: It is.

THE COURT: Oh, June 14th.

MR. WILLIAMS: Which is when --

THE COURT: I really doubt -- well, I mean, if you



want to work it out, I will see if I can do it. June 14th is, what, two weeks away now, three weeks away?

If you want to do it, see what you can work out. Okay?

MR. CONNELLY: Very good.

THE COURT: Now, one other thing. I -- I have forgotten. Okay. Anything else?

MR. WILLIAMS: Nothing, your Honor.

THE COURT: Mr. Connelly?

MR. CONNELLY: I think the last question on notice.

THE COURT: Yes.

MR. PARASHARAMI: Just one last point. We had addressed it in the briefs, but had not gotten to it here, which is that the rules are basically that the plaintiff has to pay for the cost of class notice. That's under Eisen and Oppenheimer.

So we would like the Court to clarify that the cost of notice that we experience in putting together this information has to --

THE COURT: Generally, the plaintiff pays the class notice. If the cost is insubstantial and it's not worth the time and effort, then you typically don't. I will have to see some firm documentation on what the extra expenses will be and then we'll talk about it.

MR. PARASHARAMI: Okay. Thank you, your Honor.

THE COURT: Okay? You get those declarations to me



by 5:00 p.m. tomorrow.

Okay. Thank you.

MR. WILLIAMS: Thank you, your Honor.

THE CLERK: All rise. Court is in recess.

(Proceedings adjourned.)

CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

__________________________________

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, May 22, 2018

9th Circuit Case Number(s) 18-80053

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*********************************************************************************

## CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) May 24, 2018 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) /s/ Andrew J. Pincus

*********************************************************************************

## CERTIFICATE OF SERVICE
## When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)